UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| TONIA J. ANDERSON, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 1:21CV149-PPS |
| ) | |
| KILOLO KIJAKAZI, Acting ) | |
| Commissioner of the Social Security ) | |
| Administration, ) | |
| ) | |
| Defendant. ) | |

**OPINION AND ORDER**

Tonia Anderson has appealed from an administrative law judge's denial of her application for Social Security disability insurance benefits. In doing so, she claims that the ALJ committed five errors which require a reversal of her decision, but I will limit my discussion to one: whether the ALJ erred in evaluating her mental impairments. Because I find that the ALJ erred in evaluating Anderson's mental impairments, I will REVERSE the ALJ's decision and REMAND on this issue.

**Background**

Tonia Anderson applied for disability insurance benefits on January 11, 2019, claiming that she was disabled as of February 20, 2017. [A.R.[1] 16.] In a written decision denying benefits, the ALJ determined that Anderson has the severe impairments of degenerative disc disease (DDD) of the lumbar and cervical spine with cervical disc

---

[1] The Administrative Record (A.R.) in this case is found at Docket Entry # 10. Citations are to the page number in the lower right-hand corner of the A.R.

radiculopathy, thoracolumbar scoliosis, fibromyalgia, mild neurocognitive disorder, major depressive disorder, generalized anxiety disorder, and posttraumatic stress disorder (PTSD). [A.R. 19.] The ALJ also found that Anderson has non-severe impairments of tinnitus and irritable bowel syndrome (IBS). [A.R. 19.] The ALJ then determined that Anderson did not meet any of the applicable social security listings for disability. [A.R. 19-20.]

At the next step, the ALJ determined Anderson's residual functional capacity (RFC). She determined that Anderson is capable of performing work at the light level as defined in 20 CFR § 404.1567(b) with some exceptions. She can occasionally handle, finger, and feel using the bilateral upper extremities, and she can occasionally reach overhead with the bilateral upper extremities. She can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but she can never climb ladders, ropes, or scaffolds. She should avoid concentrated exposure to extreme cold and hazards such as unprotected heights or unguarded moving machinery. In addition, she can understand, remember, and carry out simple instructions and tasks. She can make judgments on simple work-related decisions, respond appropriately to usual work situations, and deal with routine changes in a routine work setting. [A.R. 24.] I won't repeat the ALJ's description of the medical evidence included in the written decision. [*See* A.R. 24-26.]

The ALJ then posed the RFC and some additional hypothetical questions to a vocational expert (VE) who testified whether or not such a hypothetical person with

Anderson's RFC could likely find gainful employment. The ALJ determined that Anderson is unable to perform any past relevant work. [A.R. 27.] However, the ALJ found that there are jobs that exist in significant numbers in the national economy that Anderson can perform. [A.R. 28.] As a result, the ALJ found that Anderson was not disabled within the meaning of the Social Security Act and its regulations.

## Discussion

In a Social Security disability appeal, my role as district court judge is limited. I do not review evidence and determine whether a claimant is disabled and entitled to benefits. Instead, I review the ALJ's written decision to determine whether the ALJ applied the correct legal standards and whether the decision's factual determinations are supported by substantial evidence. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). If substantial evidence supports the ALJ's factual findings, they are conclusive. *Id.*; 42 U.S.C. §405(g). The Supreme Court has said that "substantial evidence" means more than a "scintilla" of evidence, but less than a preponderance of the evidence. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). "Evidence is substantial if a reasonable person would accept it as adequate to support the conclusion." *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004).

My review is guided by the principle that "[t]he ALJ is not required to address every piece of evidence or testimony presented, but must provide a 'logical bridge' between the evidence and the conclusions so that [I] can assess the validity of the agency's ultimate findings and afford the claimant meaningful judicial review." *Jones v.*

*Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). Given this modest standard, the review is a light one, but of course I cannot "simply rubber-stamp the Commissioner's decision without a critical review of the evidence." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). "[T]he decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005) (quoting *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003)).

Anderson argues that the ALJ erred in failing to support the RFC with substantial evidence. [DE 12 at 5.] Anderson makes several arguments regarding her RFC, but I will focus on her claim that the ALJ erred in evaluating her mental impairments and erred in evaluating the medical opinions regarding her mental impairments.

Anderson asserts that the ALJ misunderstood her diagnosis of mild neurocognitive impairment. [DE 12 at 5-9.] For claims filed on or after March 27, 2017, the regulations governing how an ALJ must evaluate medical opinion evidence have changed. Revisions to Rules Regarding the Evaluation of Medical Evidence, 2017 WL 168819, 82 Fed. Reg. 5844-01 (Jan. 18, 2017); 20 C.F.R. § 416.920c. The new regulations provide that an ALJ will no longer "give any specific evidentiary weight … to any medical opinion(s) …" Revisions to Rules, 2017 WL 168819, 82 Fed. Reg. 5844, at 5867-68; see 20 C.F.R. §416.920c(a). Instead, the ALJ must consider and evaluate the persuasiveness of all medical opinions or prior administrative medical findings. 20 C.F.R. §415.920c(a) and (b). The factors for evaluating the persuasiveness of medical

-4-

opinions and prior administrative medical findings include supportability, consistency, relationship with the claimant, specialization, and "other factors that tend to support or contradict a medical opinion or prior administrative medical finding." 20 C.F.R. § 416.920c(c)(1)-(5). Supportability and consistency are the most important factors to be considered. 20 C.F.R. § 416.920c(b)(2).

Anderson underwent a battery of neuropsychological testing on May 26, 2020, with Dr. Paula A. Neuman. [A.R. 506.] Dr. Neuman documented the results of each test in her opinion. [A.R. 507.] On the Saint Louis University Mental Status Examination, Anderson scored a 26, which is at "the top of the Mild Neurocognitive Disorder range of impairment." [A.R. 507.] During the clock drawing testing, Anderson "demonstrated minor visuospatial errors." [*Id.*] During another test, Anderson completed the subtask in the low average range and demonstrated mild symptoms of difficulties when put in a situation requiring quick decisions or containing multiple stimulus. [*Id.*] Anderson scored "in the very low range" on the Stroop Color Word Interference Test, which measures cognitive inhibition and impulse control related to executive functioning. [A.R. 508.] Dr. Neuman noted that people with an impairment in this area "may struggle with following complex instructions, decision making, poor judgment, inappropriate behavior, apathy, withdrawal, or maintaining a healthy diet." [*Id.*] Anderson scored "in the very low range of functioning" on the test to measure speed and accuracy of information processing. [*Id.*] Anderson also scored in "the very low range of functioning" on the immediate recognition subtest, designed to assess short

term and immediate recall. [*Id.*] Her scores on the delayed recognition subtest also fell in the low range, "indicating possible indication of dysfunction." [*Id.*] Finally, Anderson's scores on the PHQ-9 (18) and the GAD-7 (13) indicate moderately severe depression and moderate anxiety. [*Id.*]

Dr. Neuman found that the testing and evaluation indicated that Anderson is "experiencing mild neurocognitive disorder with moderate depression and anxiety, as well as PTSD." [A.R. 508.] Dr. Neuman opined that her testing was valid and there was no evidence of malingering. [*Id.*] She also opined that Anderson's "overall standard score of 58 demonstrates a significant cognitive decline for a person of her age." [*Id.*] Dr. Neuman noted that Anderson's symptoms and functioning did not warrant a diagnosis of major neurocognitive disorder, or more specifically, early onset dementia, but Dr. Neuman opined that she is "definitely experiencing challenges in her ability to function on her own." [*Id.*] Dr. Neuman further opined that working full-time would "likely deteriorate her cognition and would increase her mental health symptoms." [*Id.*]

The ALJ found this opinion to be "inconsistent with clinical diagnosis for mild neurocognitive disorder and with symptoms/functioning specifically stated not to lead the examiner to a diagnosis of major neurocognitive disorder or to early onset dementia." [A.R. 22.] The ALJ also found that Dr. Neuman seemed to rely on Anderson's "inconsistent and unsupportable" allegations, specifically noting that Dr. Neuman "appears to have relied heavily on [Anderson's] inconsistent report of losing fulltime work at Weaver Popcorn due to cognitive decline/impairment." [A.R. 21-22.]

The ALJ further found that despite Dr. Neuman's opinion that Anderson would struggle in maintaining independence, she lived independently while caring for her daughter. [A.R. 21-22.] The ALJ found that Dr. Neuman's clinical summary suggested "more than a mild neurocognitive impairment," which was inconsistent with her diagnosis of a mild neurocognitive impairment. [*Id.*] Therefore the ALJ found the clinical summary (Dr. Neuman's opinion) to be unpersuasive. [*Id.*]

As an initial matter, the ALJ misunderstands the diagnosis of mild neurocognitive impairment and how that compares to a major cognitive impairment. The term "mild" in the description of mild neurocognitive impairment does not necessarily indicate a level of severity in the same way it does in other contexts (such as mild anxiety). Neurocognitive disorders were introduced as a category in the Diagnostic Statistical Manual-5 (DSM-5) to replace the category formerly known as "dementia, delirium, amnestic, and other cognitive disorders."[2] Major neurocognitive disorder replaced "dementia or other debilitating conditions," and mild neurocognitive disorder is defined "by a noticeable decrement in cognitive functioning that goes beyond normal changes seen in aging." *Id.* Mild neurocognitive disorder includes cognitive deficits that do not interfere with the capacity for independence in everyday activities (such as paying bills or managing medications), but maintaining independence may require greater effort, compensatory strategies, or accommodations.[3]

---

[2] Sachs-Ericsson, N., & Blazer, D. G. (2014). The new DSM-5 diagnosis of mild neurocognitive disorder and its relation to research in mild cognitive impairment. *Aging & Mental Health*, 19(1), 2-12. https://doi.org/10.1080/13607863.2014.920303

[3] McDonald, W. M. (2017). Overview of Neurocognitive Disorders. *Focus (Am Psychiatr Publ)*, 15(1), 4-12.

The American Psychiatric Association states that a characteristic of mild neurocognitive disorder is that cognitive decline has reached a level "that requires compensatory strategies and accommodations to help maintain independence and perform activities of daily living."[4]

These descriptions of mild neurocognitive impairment are consistent with Dr. Neuman's findings and opinions. The ALJ found Dr. Neuman's opinion that Anderson would struggle to maintain independence without assistance from her son, her daughter-in-law, and her daughter to be inconsistent with the doctor's conclusion as to a mild neurocognitive impairment and with Anderson's ability to live on her own with her daughter. [A.R. 22.] However, Dr. Neuman's opinion *is* consistent with a mild neurocognitive disorder, which indicates the need for compensatory strategies and accommodations to maintain independence, which in Anderson's case includes help from her children. Dr. Neuman's opinion is also consistent with Anderson's ability to live on her own with her daughter, from whom she could receive assistance. The ALJ's misunderstanding of a mild neurocognitive impairment colors her analysis of both Dr. Neuman's opinion and Anderson's mental impairments.

The ALJ also erred in dismissing the basis for Dr. Neuman's findings of a mild neurocognitive impairment. [A.R. 22.] Dr. Neuman provided evidence from objective testing that indicates low levels of functioning in multiple areas. [A.R. 507-08.] Objective

---

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6519631
[4] https://www.psychiatry.org/:ile%Library/Psychiatrists/Practice/DSM/APA_DSM-5-Mild-Neurocognitive-Disorder.pdf (accessed April 26, 2022).

-8-

testing showed that Anderson had either low functioning or very low functioning in cognitive inhibition and impulse control, speed and accuracy of information processing, short term and immediate recall, and delayed recognition. [A.R. 507-08.] She also demonstrated minor visuospatial errors and scored in the low average range for switching. [*Id.*] Her overall standard score of 58 also demonstrates significant cognitive decline. [*Id.*] The ALJ dismisses Dr. Neuman's opinion as if based on this single overall score, and does not even mention the multiple tests conducted by Dr. Neuman that demonstrate low or very low functioning in multiple areas. These tests provide support for Dr. Neuman's opinion, but in failing to discuss those test results, the ALJ cannot explain how scores that indicate "very low functioning" in multiple areas are inconsistent with Anderson's mild neurocognitive impairment.

Anderson also asserts that the ALJ erred in dismissing Dr. Neuman's opinion by finding that Dr. Neuman "appears to have relied heavily on [Anderson's] inconsistent report of losing fulltime work at Weaver Popcorn due to cognitive decline/impairment." [A.R. 21-22.] Generally, an ALJ may discount a medical opinion if it is based solely on the claimant's subjective symptoms. *See Walls v. Colvin*, 2015 WL 7077340, *2-3, n.3 (N.D. Ill. Nov. 13, 2015) (discussing the importance of the word "solely"). However, a physician may consider and rely on subjective complaints if they are part of a broader analysis. *Id.* Here, Dr. Neuman mentioned Anderson's claim that she lost her job due to cognitive impairments once in her opinion. [A.R. 508.] There is no indication that Dr. Neuman "relied heavily" on this statement, as the ALJ states. [A.R.

21-22.] Dr. Neuman also discusses the objective testing, and her conclusions relied on both Anderson's reported symptoms and her functioning as indicated by the testing. [A.R. 508.] Dr. Neuman also indicated that Anderson's test scores do not indicate malingering. [*Id.*] Dr. Neuman's opinion is supported by the objective testing. While Anderson herself reported elsewhere that she was laid off due to downsizing rather than cognitive impairments, Dr. Neuman did not rely on her statement to such a degree that it overpowered the objective testing results. Dr. Neuman relied on this statement as one factor in providing her opinion. [A.R. 507-08.]

The ALJ further mischaracterized Anderson's housing situation. The ALJ found that Dr. Neuman's opinion regarding Anderson's ability to maintain independence was inconsistent with her ability to live with her daughter, as well as her continued search for living arrangements that did not include her son and daughter-in-law. [A.R. 21-22.] The ALJ paints a picture of Anderson pursuing independent housing because she no longer needed assistance from her son and daughter-in-law, but the evidence cited by the ALJ provides a different view. Treatment notes from Park Center reveal conflicts and tension between Anderson and her son and daughter-in-law, and that her son was expecting her to move out sooner than Anderson was able to realistically find living arrangements. [A.R. 456, 458.] These circumstances suggest that Anderson was moving out of necessity rather than out of a need or desire for independence, and do not show that she is capable of successfully living independently going forward.

Anderson further argues that the ALJ failed to properly consider the opinion of

-10-

the consultative psychological examiner, Dr. Russell Coulter-Kern, who conducted a consultative examination of Anderson on March 4, 2019. [A.R. 381.] Dr. Coulter-Kern reported that Anderson's motor behavior was restless, her eye contact during the interview was poor, but her thought processes were logical and consistent. [A.R. 383.] He noted that Anderson's affect was consistent with her report that she felt anxious. [*Id.*] During the mental status examination, Anderson was unable to recall the name of her junior high school, and she could only recall one of three words after a five-minute delay. [*Id.*] Dr. Coulter-Kern further noted that Anderson's scores suggest that she was cooperative with the evaluation. [A.R. 384.] In his medical source statement, Dr. Coulter-Kern opined that Anderson may have difficulty with understanding, remembering, and carrying out instructions and with coping appropriately to work pressures, but she would not have difficulty responding appropriately to supervision and coworkers in a work setting or with maintaining attention and concentration. [*Id.*] Dr. Coulter-Kern specifically stated that these statements do not take her physical limitations into account. [*Id.*]

      The ALJ barely acknowledges Dr. Coulter-Kern's opinion in her decision. The ALJ first mentions Dr. Coulter-Kern's opinion by mentioning that the state agency psychologists relied primarily on the opinion. [A.R. 20.] Dr. Coulter-Kern's opinion is only mentioned one other time, where the ALJ notes that she "has considered reported symptoms for moderate anxiety/PTSD and depression, and how such conditions might relate to some possible memory limitations also earlier cited [in] March 2019 during

-11-

[the] consultative psychological exam." [A.R. 23.] There is no other discussion of the opinion in the ALJ's decision. The ALJ erred in failing to properly discuss Dr. Coulter-Kern's opinion, particularly as Dr. Coulter-Kern's opinion provided support for Dr. Neuman's opinion.

Given that supportability is one of the two most important factors in considering medical opinion evidence, failure to consider medical evidence that supports Dr. Neuman's opinion is an error that requires remand. 20 C.F.R. § 416.920c(b)(2). Dr. Coulter-Kern and Dr. Neuman both opined that Anderson has limitations related to memory and recall. [A.R. 383-84, 507-08.] Dr. Coulter-Kern's test results related to memory and recall support both his own opinion and Dr. Neuman's opinion and are consistent with the test results from Dr. Neuman. [*Id.*] Dr. Coulter-Kern and Dr. Neuman were examining physicians who provided opinions about Anderson's mental impairments, and they are the only examining opinions in the record that considered her mental impairments. The ALJ erred in failing to discuss how these opinions supported each other and were consistent with each other.

In sum, the ALJ erred in analyzing Anderson's mental impairments. On remand, the ALJ should properly analyze Anderson's mental impairments, as well as properly explain her considerations of the medical opinions related to her mental impairments. Because I am remanding this case for that reason, I need not discuss the remaining issues raised by Anderson. She can raise those issues directly with the ALJ on remand.

ACCORDINGLY:

The decision of the Commissioner denying Tonia Anderson's application for Social Security disability benefits is REVERSED and REMANDED for further proceedings consistent with this opinion.

SO ORDERED on May 4, 2022.

/s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT